# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# CIVIL ACTION NO.: 3:10-CV-208-DSC

| | |
|---|---|
| DEBRA KEETER, Administrator of the Estate of TERRY ADAM BOONE, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| SCOTT L. BARNES, in his individual and official capacity; and THE CITY OF GASTONIA, | ) ) ) ) |
| Defendants. | ) ) ) |

## MEMORANDUM AND ORDER

**THIS MATTER** is before the Court on Defendant Scott Barnes' "Motion for Summary Judgment" (document #30) and Defendant City of Gastonia's "Motion for Summary Judgment" (document #33), as well as the parties' associated briefs, affidavits, and exhibits. See documents ## 30, 31, 32, 34, 39, 45, 46 and 47.

The parties have consented to Magistrate Judge jurisdiction under 28 U.S.C. § 636(c), and these Motions are now ripe for the Court's determination.

Having carefully considered the parties' arguments, the record, and the applicable authorities, the Court denies Defendants' Motions for Summary Judgment, as discussed below.

### I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This is an action seeking damages pursuant to 42 U.S.C. § 1983 for violation of the decedent Terry Adam Boone's rights under the United States Constitution as well as state law claims. Plaintiff

Debra Keeter, Boone's mother, is the Administrator of his Estate. It is undipsuted that on May 1, 2008, Boone was shot in the back of the head and killed by Defendant Scott L. Barnes, then an officer employed by Defendant City of Gastonia's Police Department. The parties hotly dispute the remaining material facts.

Taking the facts in the light most favorable to the Plaintiff, at around 11:00 p.m. on May 1, 2008, Gastonia Police officers Jason Gill and J.R. Smith responded to a house on South Marietta Street to investigate a reported stabbing. Defendant Barnes, an undercover vice officer in plainclothes and an unmarked vehicle, was in the area and joined them at the scene. [Gill Dep. at 32-33].[1]

As Barnes later told investigators from the Gastonia Police Department's Office of Professional Standards ("OPS"), he picked up "bits and pieces" of what was going on at South Marietta Street, namely, that a stabbing had taken place earlier and one of the men involved was in the area. [Barnes Dep., Ex. 8, D324].[2]

Barnes, Gill, and Smith soon learned that an individual named "Adam" might be either a victim or a suspect in the earlier stabbing incident. [Barnes Dep., Ex. 8, D324]. Smith testified that he went looking for this individual inside one of the houses on South Marietta Street "on the assumption that he was stabbed and injured and that was my main goal was to find him and ensure that he didn't need medical attention." [Smith Dep. at 29-30].[3]

Barnes testified at his deposition that he overheard an older man state "that the individual who had been involved in the other stabbing had -- they had got into an argument and he had slashed

---

[1] Excerpts from Gill's deposition are attached to Plaintiff's brief as Exhibit 6. Unless, otherwise noted, subsequent exhibits are also attachments to Plaintiff's brief.
[2] Exhibit 2.
[3] Exhibit 12.

2

all the tires on his vehicle." [Barnes Dep. at 46]. When Barnes heard witnesses describe "Adam," he believed that he had seen a young man fitting that description standing nearby when he first arrived on the scene. [Barnes Dep. at 38-39].

In contrast to Defendants' assertion that Barnes was interacting with witnesses and obtaining information first-hand, Gill recalls that Barnes did not speak with any of the witnesses at the scene. According to Gill, "I think he was more listening than anything else." [Gill Dep. at 35].

Officers Smith and Gill called for an ambulance and a canine unit. Defendant Barnes claims he told Officer Gill that "there was nothing more that [he] could do there" so he would ride around the block to see if he could locate "Adam." According to Gill, Barnes left the scene without saying where he was going. At that point, Gill "assumed [Barnes] was going home because we couldn't locate anybody. It was pretty much now we were just going to talk to some folks, witnesses, whatever, get some information and do a report." [Gill Dep. at 45] Barnes says he told Gill that if he did not locate the potential victim/suspect identified as "Adam," "he was going to head on back to the police department." As Barnes explained, there would be nothing more for him to do because "it was a property damage call at that point in time," referring to the tire-slashing incident. [Barnes Dep. at 52-53].

Barnes drove southbound on Marietta Street in his unmarked SUV before turning onto Gardner Street. He then continued in a northbound direction to Winget Circle. Barnes drove slowly—below the speed limit—without emergency or blue lights activated. [Barnes Dep. at 53-54]. It was after 11:00 p.m. and dark along Winget Circle. [Gill Dep., Ex. 5].

As Barnes drove up Winget Circle towards South Marietta, he heard a commotion further up the hill. He later testified that "[t]here was a lot of screaming and yelling going on, not like a party, more like some type of fight … screaming and yelling." [Barnes Dep. at 55] [4]

Barnes testified that he slowly drove up the street and suddenly saw a man, later identified as the "town drunk" Richard "Pee Wee" Mize, illuminated in his headlights about ten to fifteen yards ahead of him. Barnes testified that Mize was walking backwards downhill in the direction of Barnes's still-moving SUV, with a young man, later identified as Boone, advancing toward him. Barnes testified that Boone had a knife in his hand and was bleeding from the neck down to his waist. [Barnes Dep. at 59-60]. According to Barnes, Mize had "his hands out to his side like he's – it's like he's pleading." [Barnes Dep. at 55]. This statement is contradicted by Officer Gill, who reported that Mize was carrying a bottle of Wild Irish Rose in his hands. [Gill Dep. at 63-64].

According to Barnes, Mize suddenly turned and ran with Boone in pursuit. Barnes stopped his vehicle, grabbed his ASP baton, flashlight, and radio, and got out of his unmarked SUV. [Barnes Dep. at 64]. At no time prior to exiting his vehicle did Barnes activate his blue lights or siren. [Barnes Dep. at 53-54].

---

[4] Defendants rely substantially on facts unknown to Barnes at the time of the shooting about what transpired before he drove up Winget Circle. For example, Defendants reference records of 911 communications even though Barnes was wholly unaware of the fact and underlying substance of those calls. [Def. Barnes Memo at 4-5]. As with most of the night in question, those events are also in significant dispute. For example, according to Lorne Moses, who was in his mother's house at 100 Winget Circle, he learned just prior to the shooting that there was a commotion going on and stepped outside in time to see a female with a stick raised as if she was going to hit a man who was on the ground. Moses intervened, helped the man up, and tried to "keep people off the guy." At first he did not recognize the man, who was bloody, but then realized it was one of his neighbors named "Adam," who had a stab wound in his chest. Seeing an ambulance drive by, Moses went to flag it down and get medical help for Adam. [Moses Interview] (attached as Exhibit 10) This statement is consistent with the autopsy, which reveals that Boone had been beaten about the face and back before he died. [Boone Autopsy] (attached as Exhibit 3). Barnes himself confirms that Boone was bleeding heavily when he saw him moments later walking down Winget Circle, although when Barnes had first seen Boone earlier in the night, he did not appear to be injured.

Barnes testified that when he got to the back corner of his vehicle he saw Mize and Barnes on the ground together. Barnes did not see how the men came into contact with one another, but states that Boone had "obtained like a dominant position on the side," that Boone was stabbing Mize repeatedly, and that Mize was "throwing his hands up in a defensive posture trying to stop Mr. Boone." [Barnes Dep. 65-66].

The physical evidence, as well as statements by Officer Gill, and Mize himself directly contradict these assertions. Contrary to Defendants' assertion, Mize did not have any stab wounds after the incident. Although there was DNA on a pocket knife later recovered at the scene, the DNA did not belong to Mize. [Peter Massey's Expert Report ¶ 18].[5] The pocket knife was found in the closed position. [Sult Dep. at 38]. [6]

Moreover, Mize did not believe that he had been stabbed by Boone. In response to an officer's question at the scene, he responded with his own question: "I was stabbed?" [Gill Dep., Ex. 3, D353]. Officer Gill reported that the bottle of Wild Irish Rose Mize was carrying remained unbroken in his hand when Gill helped him off the ground a few moments after the shooting. [Gill Dep. at 63-64]. This bottle of Wild Irish Rose was conspicuously absent from Barnes's version of the events.

Barnes testified that after he witnessed Boone stabbing Mize, he shouted at Boone to stop. Barnes says he was approximately ten feet from Boone at the time. He testified that Boone took steps toward him, getting within five or six feet, at which point Barnes "punched out" his weapon. [Barnes Dep. at 68-69]. Barnes testified that Boone then "t[ook] off" and he pursued him.

---

[5] Massey's expert report is attached as Exhibit 9.

[6] Excerpts from Gastonia Police Department Chief Terry Sult's deposition are attached as Exhibit 14.

Barnes testified that he chased Boone for approximately twenty yards, heading northeast toward a wooded area and away from the collection of people Barnes had seen to the west on Winget Circle. [Barnes Dep., Ex. 8, D329; Area Schematics].[7]

Barnes testified that Boone suddenly stopped and turned back toward him in an "aggressive motion." Barnes testified: "He stopped and turned. I started to stop because I was – now that he stopped and turned now I'm increasing or decreasing the distance between us. So I'm stopping and coming up and as soon as I punch out and everything I squeeze off a round." [Barnes Dep. at 76].

Officer Smith, who was approximately ten to fifteen yards from Barnes at the time, did not hear any commands given before the shooting. [Smith Dep., Ex. 2, D357].[8] Gaston County Assistant EMS Supervisor Tim Jones, who responded to Winget Circle just prior to the shooting, also did not hear any commands before the shooting. [Jones Interview].[9]

There is evidence contrary to the claim that Barnes fired after Boone turned to face him. First, there is the undisputed fact that Barnes shot Boone in the back of the head. [Complaint ¶ 15; Answer ¶ 1] In addition, Gill testified that Barnes was standing still when he shot Boone, contrary to Barnes' claim that he was moving toward him with his "forward momentum." [Gill Dep. at 70].

The distance between the two when Barnes fired his weapon is also disputed. Barnes initially told investigators from the State Bureau of Investigation (SBI) and OPS that he was approximately ten to twelve feet from Boone when he fired. Barnes later testified that he was twenty to twenty-five

---

[7] Area Schematics are attached as Exhibit 11.

[8] Referenced exhibit from Smith's deposition is attached as Exhibit 13.

[9] Jones Interview is attached as Exhibit 8.

feet from Boone when he shot him. [Barnes Dep. at 121].[10] Gastonia Police Chief Terry Sult estimated the distance to be as much as thirty-four feet. [Sult Dep. at 58]. Officer Gill, who witnessed the shooting, told OPS that it was twenty to twenty-five yards (or sixty to seventy-five feet). [Gill Dep., Ex. 3, D352].

Within a few hours of the shooting, Barnes was interviewed independently by the SBI and OPS. Both interviews were recorded. During and possibly before his interview with OPS, Barnes received information from fellow officers about the shooting victim, as well as the on-going crime scene investigation. For example, Barnes was informed by OPS that Boone had "been charged with some drug stuff" [Barnes Dep., Ex. 8, D343], and that crime investigators had supposedly recovered a knife "near the body." [Barnes Dep., Ex. 8, D346]. Chief Sult even asked Barnes his opinion of a press release about the shooting that the department issued on May 2, 2008. [Barnes Dep. at 122-124]. This sharing of information was in violation of Defendant City of Gastonia's own policies, which make clear that facts unknown to the officer involved in the use of deadly force cannot be considered in determining whether the shooting was justified. [Sult Dep., Ex. 1].[11] As Gill testified, he was initially told to sit in a patrol vehicle once it was determined that he witnessed the shooting. Gill explained that "Because of my involvement. They didn't want anybody, well, myself or Smith or Barnes running around, you know, saying, oh, this is what happened, this is what happened, this – and start, you know, spreading the rumors. And, you know, you want to keep that contained and

---

[10] When Barnes met with investigators from the SBI and OPS on May 2, 2008, he asserted that he was between 10 and 12 feet from Adam Boone when he shot him. [Barnes Dep., Ex. 8, D329]. Barnes stuck to this version of the distance until March 7, 2011, when he admitted during his deposition that the distance was approximately 20 to 25 feet. [Barnes Dep. at 121].

[11] Referenced exhibits from Sult's deposition are attached as Exhibit 15.

7

controlled until you speak with SBI and Internal Affairs and do the proper investigation." [Gill Dep. at 92-93].[12]

Approximately five months later, on October 2, 2008, Chief Sult cleared Barnes of any wrongdoing in the shooting. [Sult Dep. at 52]. Barnes was no longer working for the City of Gastonia by the time he was cleared. He had been terminated months earlier due to "a readily discernible pattern of misconduct," which included "inattention to duty, and failure to obey lawful orders." According to Sult, the nature of Barnes's offenses was "extremely serious" and was "strikingly similar" to prior misconduct he had displayed. [Sult Dep. at 82-83]. The Defendant City upheld Chief Sult's recommendation on August 25, 2008, when it confirmed through the City Manager that Barnes's violations were "disturbing in their magnitude and repetitiveness." [Brafford Dep., Ex. 13, D759].[13]

Barnes's discharge came about after Defendant City of Gastonia investigated misconduct that both preceded and followed the shooting of Boone. OPS opened Internal Affairs Case No. 08-103 approximately one month (June 3, 2008) after Boone's death, while the shooting investigation was still underway. [Sult Dep. at 80]. That investigation was finalized on August 25, 2008, well before the shooting investigation was closed on October 2, 2008. [Brafford Dep., Ex. 13].

Defendant City of Gastonia found during its investigation that prior to and at the time of the shooting, Barnes had been involved in an illicit sexual affair with fellow officer Nikki Armstrong. The City's investigation established that Defendant Barnes was willing to commit crimes, misuse the powers of his office, and lie repeatedly. [Sult Dep. at 81-83, 113-115; Barnes Dep. at 204].

---

[12] Defendants have emphasized that a person at the scene of the fight on Winget Circle called 911 and stated that Boone was "on Pee Wee" and had gone crazy. Given the circumstances and distances involved, the validity of this statement is highly suspect.

[13] Excerpts from Police Sergeant Reid Brafford's deposition are attached as Exhibit 4. Brafford was the lead Internal Affairs investigator into the shooting.

8

For example, in an effort to trick Armstrong into believing that he was separated from his wife, Barnes created a fake separation agreement in July 2007; signed his name and forged his wife's signature on the document; forged a notary's signature; forged the file stamping of the Gaston County Clerk of Superior Court; and presented the fake document to Armstrong so that she would continue the affair with him. Chief Sult found that this conduct established probable cause to believe that Barnes had committed common law forgery, common law uttering of a forged paper, and common law obstruction of justice. [Sult Dep. at 113; Brafford Dep. at 69-71].

Chief Sult also found that on June 29, 2008—while the OPS investigation into the shooting death of Adam Boone was still underway—Barnes made false statements to a telephone company in an effort to obtain records, which constitutes a felony under North Carolina law. [Sult Dep. at 71-73]. Chief Sult also determined that Barnes blatantly misused the law enforcement information system for his own ends. [Sult Dep. at 114].

The City's investigation also revealed that prior to the shooting, Barnes had been spending an extraordinary amount of time focused on his affair with Armstrong while on duty. The City's investigation established that Barnes was making hundreds of calls to Armstrong while on duty, in violation of departmental policy. For example, Barnes called Armstrong 27 times while on duty on April 23, 2008, and made 88 calls to Armstrong while on duty on April 24, 2008. [Barnes Dep. at 145-146]. When asked during deposition whether these on-duty personal calls distracted Barnes from doing his job, Chief Sult testified "Absolutely. He was inattentive to his duties when he was doing that." [Sult Dep. at 117].

The investigation revealed that Barnes's fixation on this relationship was especially acute during the days leading up to the shooting, as Barnes himself admitted: "[r]ight there towards the ends of the relationship … things were getting a lot tougher." [Barnes Dep. at 212]. On April 26,

2008, five days before the shooting, Barnes wrote to Armstrong about the possible end of their relationship and his inability or unwillingness to accept it:

> The last two weeks have been rough for both of us.... Do you know how bad you have hurt me here lately or do you even care anymore? I'm sorry for showing my ass yesterday, but I have always thought you were worth fighting for to keep in my life.... I don't now [sic] how I'm going to deal with not having [sic] in my life.

[Brafford Dep., Ex. 9]. Chief Sult has conceded that this letter reflects things were not going "smoothly" for Barnes at that point in time.[14] [Sult Dep. at 120].

Despite his relationship with Armstrong, and the fact that the days leading up to the shooting were "particularly rough," Barnes did not share any of this information with OPS or the SBI when they were investigating the shooting. Instead, Barnes purposefully concealed the relationship, including information that was material to the respective investigations. For example, both the SBI and OPS asked Barnes to describe what he had been doing prior to the shooting. Presumably to keep his affair secret, Barnes did not disclose that while on-duty at 9:30 p.m. on May 1, 2008, he had gone to visit Armstrong. [Barnes Dep. at 205-206]. Barnes also withheld from investigators that on the day of the shooting, he called Armstrong at least 13 times from his cell phone. [Sult Dep. at 138]. Barnes omitted the fact that he had called Armstrong at 8:33 p.m., 8:34 p.m., 9:00 p.m., 9:24 p.m., and 11:14 p.m. on May 1, 2008—the last call coming within seconds of the shooting. Barnes also failed to tell investigators that he called Armstrong fifteen minutes after the shooting, and then twice more between his SBI and OPS interviews. [Sult Dep. at 144, 152; Sult Dep., Ex. 6].

Defendant City of Gastonia's investigative files concerning both the shooting and the Armstrong-related investigation reveal that the City never confronted Barnes about his deliberate

---

[14]Barnes asserted under oath during his deposition that he did not write the letter in question (or, in fact, other letters contained in the City's OPS file). [Barnes Dep. at 210-212]. Defendant City of Gastonia has confirmed that the letters in question were written by Barnes. [Brafford Dep. at 59-62].

omissions, and never asked him what he and Armstrong discussed at those critical points in time. [Sult Dep. at 153-155]. This was despite the fact that Barnes provided significant information about his contacts with Armstrong on the night of the shooting, such as reporting that Armstrong blamed herself for the fact that Barnes shot Boone. [Barnes Dep. at 207].[15]

Prior to clearing Barnes in the shooting death of Boone on October 2, 2008, Defendant City of Gastonia had already established not only that Barnes was distracted by the affair, but also that he could not be trusted as a credible source of information. As Chief Sult has testified:

> As of October 1, 2008, information had come to my attention and resulted in an internal investigation that I would consider is exculpatory under the Giglio and Brady issues that goes towards his credibility as a witness, that could be used to impeach him.

In response to whether Barnes's credibility problem applied to "anything that might come out of his mouth," Chief Sult answered (over objection): "Yes." [Sult Dep. at 53].

On April 30, 2010, and after having qualified as Administrator of Boone's Estate, Plaintiff filed her Complaint. Plaintiff initially alleged four claims for relief: a claim against Barnes under 42 U.S.C. § 1983 for excessive force; a claim against Barnes and the City for "negligence, gross negligence, and wrongful death," including an allegation that the City failed to adequately train and supervise Barnes; a state law assault and battery claim against Barnes; and a claim against Barnes for violation of Boone's right to substantive due process under the North Carolina Constitution. All claims against Barnes were pled against him in his individual and official capacities.[16]

---

[15] Barnes also failed to disclose in his discovery responses the fact that he had spoken with Armstrong about the shooting of Boone. Barnes's certified response to Plaintiff's Interrogatory No. 13, which asked Barnes to state the name of all person with whom he had discussed the matters described in the Complaint, conspicuously failed to mention Armstrong. [Barnes Dep., Ex. 1; Barnes Dep. at 216].

[16] To the extent a plaintiff's § 1983 claims are brought against a law enforcement officer in his official capacity, the claims are treated as claims against the officer's employing agency. Brandon v. Holt, 469 U.S. 464, 471-72 (1985) ("An official capacity suit is, in all respects other than name, to be treated as a suit against the entity").

11

In her "Response ..." at 33, n. 22 (document #39) and "Notice of Clarification" (document #47), Plaintiff has withdrawn her § 1983 claim against the Defendant City and/or against Defendant Barnes in his official capacity, as well as her claim against the City for negligent training, retention and supervision.

In its briefs, the Defendant City stipulates that is has waived sovereign immunity through the purchase of liability insurance.

Defendants' Motions for Summary Judgment have been fully briefed and are, therefore, ripe for disposition.

## II.  DISCUSSION OF CLAIMS

### A.  Standard of Review

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment should be granted when the pleadings, responses to discovery, and the record reveal that "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." See also Charbonnages de France v. Smith, 597 F.2d 406 (4th Cir. 1979). Once the movant has met its burden, the non-moving party must come forward with specific facts demonstrating a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  However, the party opposing summary judgment may not rest upon mere allegations or denials and a "mere scintilla of evidence" is insufficient to overcome summary judgment. Id. at 249-50.

When considering summary judgment motions, courts must view the facts and the inferences therefrom in the light most favorable to the party opposing the motion.  Id. at 255; Miltier v. Beorn,

896 F.2d 848 (4th Cir. 1990); Cole v. Cole, 633 F.2d 1083 (4th Cir. 1980). Indeed, summary judgment is only proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there [being] no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotations omitted).

### B. Section 1983 Excessive Force Claim

Defendant Barnes has pled the affirmative defense of qualified immunity. As the Fourth Circuit Court of Appeals has most recently stated:

> Qualified immunity shields government officials performing discretionary functions from personal-capacity liability for civil damages under § 1983, insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Ridpath v. Board of Governors Marshall University, 447 F.3d 292, 306 (4th Cir.2006) (quoting Wilson v. Layne, 526 U.S. 603, 609 (1999)) (internal quotation marks omitted). Officials will receive immunity unless the § 1983 claim satisfies a two-prong test: (1) the allegations, if true, substantiate a violation of a federal statutory or constitutional right and (2) the right was "clearly established" such that a reasonable person would have known his acts or omissions violated that right. Id.; see also Saucier v. Katz, 533 U.S. 194, 201 (2001), modified by Pearson v. Callahan, 555 U.S. 223 (2009) (setting up this two-pronged framework).

Brockington v. Boykins, 637 F.3d 503, 506 (4th Cir. 2011).

In Brockington, the Fourth Circuit also stated the analysis required to determine whether a plaintiff has met her burden under the two-prong test articulated above, as follows:

> [W]e must evaluate the reasonableness of the officer's use of deadly force under a multifactor analysis set forth in Graham v. Connor, 490 U.S. 386, 396–97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Graham governs our analysis of seizures alleged to have been effected in violation of the Fourth Amendment, and more specifically situations where excessive force is employed. 490 U.S. at 399, 109 S.Ct. 1865; see also Jones v. Buchanan, 325 F.3d 520, 527 (4th Cir.2003) (barring excessive force in effecting seizures). Graham specifies that whether force is excessive or not is based on "objective reasonableness" under the circumstances "without regard to [the officer's] underlying intent or motivation." 490 U.S. at 390, 397, 109 S.Ct. 1865. "In assessing whether an officer's actions were objectively reasonable, 'we weigh the nature and quality of the intrusion on the individual's Fourth Amendment interests

13

against the countervailing governmental interests at stake.' " Turmon v. Jordan, 405 F.3d 202, 207 (4th Cir.2005) (quoting Buchanan, 325 F.3d at 527) (internal punctuation omitted). "The nature of the intrusion on a plaintiff's Fourth Amendment rights is generally measured by 'the amount of force employed to [e]ffect the seizure.' " Id. ( citing Howerton v. Fletcher, 213 F.3d 171, 173 (4th Cir.2000)). "The extent of the plaintiff's injuries is also a relevant consideration." Id. (citing Buchanan, 325 F.3d at 527.). "Several factors are considered in assessing the governmental interests at stake, including the 'severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officer [ ] or others, and whether he ... actively resisted arrest or attempted to evade arrest by flight.' " Id. (citing Graham, 490 U.S. at 396, 109 S.Ct. 1865). "Because 'police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving,' the facts must be evaluated from the perspective of a reasonable officer on the scene, and the use of hindsight must be avoided." Waterman v. Batton, 393 F.3d 471, 476–77 (4th Cir.2005) (citing Graham, 490 U.S. at 396–97, 109 S.Ct. 1865).

Brockington, 637 F.3d at 506-07.

As Plaintiff points out in her brief, the Fourth Circuit has repeatedly recognized that questions of fact regarding the circumstances in which an officer uses force are reserved for the jury. See Melgar v. Green, 593 F.3d 348, 356 (4th Cir. 2010) (questions of fact require denial of summary judgment regarding reasonableness of force used); Clem v. Corbeau, 284 F.3d 543 (4th Cir. 2004) (factual dispute over whether unarmed mentally ill man who had been pepper sprayed was a threat to officer); Buchanan, 325 F.3d at 527 (conflicting evidence as to whether belligerent drunk suffered broken nose); Gray Hopkins v. Prince George's County, MD, 309 F.3d 224 (4th Cir. 2002) (jury must decide whether decedent was standing with hands overhead at time he was fatally shot); Vathekan v. Prince George's County, 154 F.3d 173 (4th Cir. 1998) (evidence in dispute regarding whether officer gave verbal warning before police dog attack); Rowland v. Perry, 41 F.3d 167 (4th Cir. 1994) (questions of fact regarding scuffle with mentally impaired man over five dollar bill); Kopf v . Wing, 942 F.2d 265 (4th Cir. 1991) (evidence conflicted regarding use of police dog and blackjack to subdue fleeing suspect). See also Smith v. Kendall, 369 Fed. Appx. 437, 439, 2010

14

WL 764051, at *2 (4th Cir. Mar. 8, 2010) (unpublished) (dismissing defendants' appeal from denial of summary judgment motion by affirming district court's reliance "on the parties' conflicting accounts of the events that immediately preceded the shooting … [to] conclude[] that there existed in the record evidence from which a reasonable trier of fact could conclude that Smith was not posing an imminent threat to Kendall at the time Kendall fired his weapon"). This is particularly true when "the witness most likely to contradict [the defendant officer's] story – the person shot dead – is unable to testify." Ingle v. Yelton, 439 F.3d 191, 195 (4th Cir. 2006). See also Witt v. West Virginia State Police, Troop 2, 633 F.3d 272, 276 (4th Cir. 2011) (noting with approval District Court's finding that "the credibility of testimony" and "the reliability of documentary evidence" presented genuine disputes as to "crucial facts"); Culosi v. Bullock, 596 F.3d 195 (4th Cir. 2010) (denying summary judgment where credibility of defendant officer is significant factor).

The Fourth Circuit has recently emphasized:

> Qualified immunity does not override the ordinary rules applicable to summary judgment proceedings, nor does it give special substantive favor to the defense. Hence, [the Fourth Circuit's] longstanding instruction that courts "reserve[ ] for trial" genuine issues of material fact relating to an "officer's conduct or its reasonableness under the circumstances."

Henry v. Purnell, 619 F.3d 323, 333 (4th Cir. 2010) (quoting Pritchett v. Alford, 973 F.2d 307, 313 (4th Cir.1992) (remaining internal quotations and citations omitted).

Applying these legal principles to the facts taken in the light most favorable to the Plaintiff, it is clear that Defendant Barnes is not entitled to qualified immunity and that his Motion for Summary Judgment on Plaintiff's single § 1983 claim must be denied. Barnes does not dispute whether Boone's constitutional rights were clearly established when he shot him. Rather, Barnes contends he is entitled to qualified immunity only on the theory that the shooting was reasonable, a theory based entirely on his own version of events. Because of the numerous factual disputes in

15

this case—including material facts that cut to the heart of any reasonableness inquiry—summary judgment cannot be granted on qualified immunity grounds. A reasonable jury considering the evidence - especially the undisputed fact that Boone was shot in the back of the head; the disagreement between the officers themselves about whether Boone ever attacked Mize with a knife and the distance between Boone and Barnes at the time the officer fired his weapon - would be permitted, although not compelled, to conclude that Barnes shot Boone at a distance of sixty to seventy-five feet, while he was running away and posed no immediate threat to Barnes or any other person.

Due to these issues of material fact directly related to the shooting, Plaintiff has met her burden under the Saucier test of showing that (1) Defendant Barnes' use of deadly force violated Boone's right to be free from such a "seizure" of his person and (2) the right was "clearly established" such that a reasonable person would have known his acts or omissions violated that right. 533 U.S. at 201.

### C. State Law Claims

For the same reasons discussed above, a jury could also reasonably conclude that Defendant Barnes, and vicariously the Defendant City, violated Boone's rights under the North Carolina Constitution and State common law. Accordingly, Defendants' Motions will be denied as to these claims as well.

### III. ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED:**

1. Defendant Scott Barnes' "Motion for Summary Judgment" (document #30) and Defendant City of Gastonia's "Motion for Summary Judgment" (document #33) are **DENIED**.

16

2. The Clerk is directed to send copies of this Memorandum and Order to counsel for the parties.

**SO ORDERED, ADJUDGED AND DECREED.**

Signed: May 23, 2011

David S. Cayer
United States Magistrate Judge